Todd **WALKER, as Personal Representative of the Estate of Michael Walker, deceased, Appellant–Defendant,**

v.

**Joan CUPPETT, Appellee–Plaintiff.**

No. 29A02–0212–CV–1039.

Court of Appeals of Indiana.

May 5, 2004.

Marc Lloyd, Smith, Fisher, Maas & Howard, Indianapolis, IN, Attorney for Appellant.

Robert E. Lehman, Lehman & Associates, Indianapolis, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

The Estate of Michael Walker appeals the trial court's judgment against it in the amount of $81,808.79 in a personal injury action brought by Joan Cuppett. We reverse and remand.

### Issues

The issues we address today are:

I. whether the trial court improperly precluded the Estate from introducing into evidence unredacted versions of Cuppett's medical records and bills, limited the Estate's examination of three doctors, and excluded Walker's videotaped deposition from evidence; and

II. whether the trial court abused its discretion in refusing to grant the Estate leave to conduct an independent medical exam ("IME") of Cuppett.

### Facts

On February 3, 1998, Walker rear-ended Cuppett's car. Cuppett initially did not complain of any injuries, and no ambulance was called. While driving home, however, she began experiencing pain in her neck, right shoulder, and right elbow, and she stopped at a chiropractor's office to receive treatment for that pain. She also claims to have begun experiencing severe headaches that night, which have continued off and on since that time. Cuppett also testified that she has continued to have pain on the right side of her neck and in her right shoulder intermittently since the accident; her right elbow pain went away after about a month.

Cuppett first visited her family physician, Dr. Patrick Foley, regarding her neck, shoulder, and elbow pain on February 11, 1998, eight days after the accident. At this visit, Dr. Foley told Cuppett that her pain was most likely related to soft tissue injury, but he ordered x-rays, then a CT scan, to be taken of her elbow and neck to rule out any fractures. The x-rays and CT scan did not reveal any fractures, but did reveal the existence of degenerative arthritic conditions in her cervical spine, i.e. her neck, that were more pronounced on the right side. At the February 11 visit, Dr. Foley also refilled Cuppett's prescription for Fiorinal, a headache medicine that she apparently had been taking before the accident. Cuppett also continued seeing her chiropractor, and a note in the chiropractor's chart indicated that she was released from treatment in December 1998. However, Cuppett actually continued visiting the chiropractor until June 2000; at many of these visits Cuppett was treated for pain in her lower back and/or knee, which she has never

claimed was caused by the accident, as well as for neck pain and headaches.

Cuppett stopped seeing Dr. Foley at the end of 1998. At her first visit with her new primary care doctor in January 1999, she made no complaints of neck pain. However, she did make such complaints at later visits, during which she was also treated at various times for other ailments or conditions including allergies, hypertension, high cholesterol, asthma, gastroesophageal reflux disease, menopause, degenerative conditions in her knees, and obesity. Cuppett also had been diagnosed with fibromyalgia before the accident. In June of 2000, Cuppett's primary care doctor referred her to the Pain Management Center of Community Hospitals Indianapolis for treatment of her continuing neck pain. She was initially seen there by Dr. David O'Brien, who opined that her chronic neck pain was consistent "with possible mild facet arthritis since that mediated the pain and/or some myofascial pain in the soft tissues in the right cervical paraspinal region." Def. Ex. A. Thereafter, Cuppett was under the care of Dr. James Crawford, who believed her neck pain was caused solely by myofascial problems stemming from the 1998 automobile accident and treated her accordingly. She has visited physical therapists, an acupuncturist, and a pain psychologist for treatment of her neck pain. Dr. Crawford testified in an evidentiary deposition that Cuppett's continuing neck pain was caused by the accident, that all of her claimed medical bills related to that pain were reasonable and necessary because of the accident, and he also outlined his estimate of her future medical bills.

Cuppett sued Walker on May 27, 1998. As part of a pre-trial order, the parties were required to name their expert witnesses by October 1, 2000. Walker did not name any expert witnesses by that date.

Additionally, Walker was required to schedule any IME of Cuppett no later than ninety days before trial. Walker died in May 2001, but not before he gave a videotaped evidentiary deposition in which he described the accident and his interaction with Cuppett immediately thereafter.

Eventually, a trial date of April 9, 2002, was set. On February 25, 2002, the trial court granted partial summary judgment to Cuppett on the issue of liability, finding Walker was 100 percent at fault for the accident. On March 25, 2002, the Estate filed its first motion for leave to allow an IME of Cuppett, for the stated reason that it had just learned for the first time that Cuppett had continued seeing her chiropractor from December 1998 to June 2000. On April 8, 2002, the trial court continued the trial, which was eventually re-set for November 12, 2002. It did not rule on the Estate's motion for an IME until November 4, 2002, at which time it denied the motion. On the same day, the trial court granted Cuppett's motion in limine to prevent the Estate from presenting "Any Evidence of a Pre–Existing Affliction or Condition Not Supported by Admissible Expert Medical Opinion," "Any Evidence of Unrelated and Post–Collision or Subsequent Injuries/Occurrence Not Supported by Admissible Medical Opinion," or "Any Evidence of Low Impact Collision and Relationship to Joan Cuppett's Physical Injuries." App. pp. 117–18. Because of this ruling, Cuppett was allowed to redact from her medical records any reference to the arthritis or other non-accident related conditions in her neck, her diagnosis of fibromyalgia, and her pre-accident treatment for headaches. Cuppett was also allowed to prevent the jury from hearing any reference to these matters in pre-trial evidentiary depositions conducted of Dr. Crawford and one of her physical therapists, Dr. David Cross, or in the trial testimony of Dr. Foley. The re-

mainder of the depositions of Drs. Crawford and Cross were presented to the jury; Dr. Foley also was permitted to testify to other matters. Cuppett also redacted any mention of other ailments in the medical bills she submitted into evidence and that she sought to collect from the Estate. The trial court also prevented the Estate from presenting any of Walker's evidentiary deposition to the jury.

A jury trial on the issue of damages commenced on November 12 and ended on November 15, 2002. At the conclusion of the evidence, Cuppett moved for judgment on the evidence. The trial court granted the motion in part with respect to all of Cuppett's claimed past medical bills in the amount of $17,025.99; it denied the motion with respect to her claimed future medical expenses. The jury then returned with a total verdict of $27,026.00, which included the judgment on the evidence amount. On December 12, 2002, Cuppett moved for Indiana Trial Rule 37 sanctions against the Estate for failing to admit certain facts with respect to her claimed damages. Cuppett also moved simultaneously for additur and judgment notwithstanding the verdict. On December 16, 2002, the Estate filed its notice of appeal. On January 14, 2003, the clerk of the trial court completed the record and the Estate filed its case summary. On February 11, 2003, the trial court granted Cuppett's motion for sanctions. It also granted additur, finding Cuppett was entitled to future medical expenses of $64,783, based on Dr. Crawford's testimony, for a total judgment of $81,808.79 when added to the past medical expenses. We have consolidated the Estate's appeals from the original judgment and the February 11, 2003 rulings.

## Analysis

■ Initially, we note that the Estate challenges the trial court's jurisdiction to grant additur. Specifically, the trial court did not grant that motion until February 11, 2003, after the trial court clerk had, on January 14, 2003, filed her notice of completion of the clerk's record, based on the Estate's December 16, 2002 notice of appeal. Under Indiana Appellate Rule 8, we acquire jurisdiction over an appeal on the date the trial court clerk issues her "Notice of Completion of Clerk's Record." "[I]t is well-established that the trial court is deprived of further jurisdiction when appellate jurisdiction is acquired." *Southwood v. Carlson*, 704 N.E.2d 163, 165 (Ind. Ct.App.1999). However, it is also true that "there are situations in which a trial court may retain jurisdiction and act notwithstanding an appeal," although a trial court "is not permitted to intermeddle with the subject-matter of the appeal." *Bradley v. State*, 649 N.E.2d 100, 106 (Ind. 1995). A trial court does retain jurisdiction to adjudicate those claims that remain unresolved at the time it otherwise would have lost jurisdiction. *Donahue v. Watson*, 413 N.E.2d 974, 976 (Ind.Ct.App. 1980).

This is a complex question. On the one hand, the trial court's grant of additur went to the very subject-matter of the appeal. On the other hand, Cuppett's motion for additur was filed before the Estate's notice of appeal and the clerk's notice of completion of the record, and such a motion was a prerequisite to her taking an appeal challenging the adequacy of the judgment. Ind. Trial Rule 59(A)(2). We do not perceive a clear answer to this conundrum. However, because we conclude the trial court erred in granting additur, based on its evidentiary rulings, it is unnecessary to definitively resolve this jurisdictional question.

## I. Exclusion of Evidence/Limitation of Cross Examination

The first, and most significant, interrelated issues we address are the propriety

of the trial court's decisions precluding the Estate from presenting the following evidence: those parts of certain medical tests and records indicating Cuppett had arthritis and cervical disc degeneration, which were more pronounced on the right side of her neck; Cuppett's medical history that predated the accident of fibromyalgia and having received prescription medication for headaches; the testimony of Drs. Crawford, Cross, and Foley related to these tests and reports; and the videotaped testimony of Walker concerning the accident itself and his interaction with Cuppett immediately thereafter.[1] The trial court excluded all of this evidence and testimony on the grounds that it was irrelevant and/or highly prejudicial.

We review decisions concerning the admissibility of evidence for an abuse of discretion. *Fairfield Development, Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship,* 768 N.E.2d 463, 466 (Ind.Ct.App. 2002), *trans. denied.* An abuse of discretion occurs if the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.* A trial court may also abuse its discretion if its decision is without reason or is based upon impermissible considerations. *Childress v. Buckler,* 779 N.E.2d 546, 550 (Ind.Ct.App.2002). "Even if a trial court errs in a ruling on the admissibility of evidence, this court will only reverse if the error is inconsistent with substantial justice." *Fairfield Development,* 768 N.E.2d at 466–67. Similarly, the trial court has discretion to determine the scope of cross-examination and only an abuse of that discretion warrants reversal. *Lowry v. Lanning,* 712 N.E.2d 1000, 1001

(Ind.Ct.App.1999). "Cross-examination is permissible as to the subject matter covered on direct examination, including any matter which tends to elucidate, modify, explain, contradict or rebut testimony given during direct examination by the witness." *Hicks v. State,* 510 N.E.2d 676, 679 (Ind.1987).

In the interests of judicial economy, we will not reproduce here every one of Cuppett's exhibits that the Estate claims was erroneously redacted. Following are the most relevant portions of Cuppett's exhibits that the trial court allowed her to redact, with the redacted words being italicized. From Plaintiff's Exhibit 29, a "Progress Note" prepared by Dr. David O'Brien, dated July 28, 2000:

PAST MEDICAL HISTORY: Significant for ... arthritis, and she reports being diagnosed with fibromyalgia.

\* \* \* \* \*

REVIEW OF SYSTEMS: She denied any fever, sweats, or weight loss. HEENT was significant for allergies. Cardiac was negative for chest pains or palpitation. Respiratory was significant for some asthma type allergies. GI and GU were negative for any complaints. *Musculoskeletal is noted as above for some arthritic joint pain and swelling. Neurologic was only remarkable for some sinus headaches occasionally, otherwise* review of systems was noncontributory. Please see our questionnaire in the chart for more information.

\* \* \* \* \*

IMPRESSION: Chronic right sided neck pain, *etiology is consistent with*

---

1. Cuppett briefly contends that the Estate waived its claims of evidentiary errors by failing to properly object or present offers of proof. She does not point to occasions in the record on which the challenged evidence was introduced without objection, and we find the record to be replete with objections, arguments, and offers of proof by defense counsel with respect to this evidence.

*possible mild facet arthritis since that mediated the pain and/or some myofascial pain in the soft tissues in the right cervical paraspinal region.*

From Plaintiff's Exhibit 17, notes prepared by Dr. Foley on February 11 and 28, 1998:

I told her I thought this was probably all soft tissue injury, myositis and contusion to the elbow. Will obtain an X-ray of her cervical spine w/obliques and her rt. elbow. I recommended that she get on a regimen of ice, ROM exercises which I gave her a handout of and Tylenol p.r.n. for pain. *Refilled her FIORINAL that she takes p.r.n. for HA's.*

\* \* \* \* \*

Told pt. X-ray show Ø FX. *some arthritis in neck.*

From Plaintiff's Exhibit 20, the results of a CT scan ordered by Dr. Foley performed on February 28, 1998:

No fractures of the cervical spine are identified.

*Mild spondylitic changes of the cervical spine are noted consisting of mild posterior osteophyte formation and uncovertebral joint hypertrophy. This create [sic] mild neural foraminal compromise which is most pronounced on the right at C3–4.*

Also, as a general rule, Cuppett redacted any other references to arthritis or fibromyalgia found in her medical records.

Following is some of the most pertinent deposition cross-examination testimony of

Dr. Crawford that the trial court did not allow the jury to hear, which related to the relevance of the redacted records: his being directed to Dr. O'Brien's conclusions about arthritis being a possible cause of her neck pain; his admission that x-ray and CT scan findings were consistent with that diagnosis; his description of neural foraminal compromise as a condition where spinal cord nerves exit through holes in the spine; his description of arthritis as a condition causing pain and inflammation at the site at which it is located; and that fibromyalgia may cause generalized muscle pain as well as headaches. Any mention of arthritis in Dr. Cross' deposition cross-examination testimony was also excluded.

As for Dr. Foley, he testified during the Estate's offer of proof that Cuppett had been on Fiorinal, a headache medicine,[2] prior to the accident, but he could not recall precisely what type of headaches she had been suffering from.[3] Dr. Foley also testified as to the February 28, 1998 CT scan of Cuppett's cervical spine as showing degenerative or arthritic changes in several places that were more pronounced on the right side of her neck; he also described arthritis and foraminal compromises and testified that they cause pain. Dr. Foley also testified that at least part of the reason he referred Cuppett to physical therapy for continuing neck pain following the accident was due to the arthritic changes in her cervical spine. However,

2. Fiorinal does not appear to be a garden-variety headache medicine. It is a combination of aspirin, caffeine, and butalbital, which is a potentially habit-forming barbiturate; it is used primarily for the treatment of complex tension headaches. *See* http://my.webmd.com/content/drugs/1/4046_1381.html.

3. Cuppett erroneously suggests in her brief that Dr. Foley "could not render any causal

opinion with respect to the *sinus* headaches Cuppett may have had before the collision...." Appellee's Br. p. 22 (emphasis added). In fact, Dr. Foley could not answer plaintiff's counsel's question whether Cuppett's pre-accident headaches were sinus headaches, or what kind they were at all, because this information was not in the notes he had before him.

the trial court did not permit the jury to hear any of this testimony.

Before he died, Walker gave a videotaped deposition in which he testified that he was traveling no more than twenty miles per hour when he first noticed Cuppett's brake lights in front of him and applied his brakes, and had slowed to one or two miles per hour when he actually struck Cuppett's rear bumper. He also testified that Cuppett "complained of no problems whatsoever" when he asked her if she was okay. Defendant's Ex. L, p. 11. Walker also identified photographs of his and Cuppett's vehicles taken after the accident, which revealed a scratch on Cuppett's rear bumper and no other damage. Finally, he testified that neither the police nor an ambulance were called to the scene. The trial court prevented the Estate from placing any of Walker's deposition into evidence.

■ The sum effect of the trial court's evidentiary rulings was that the Estate could make no mention of Cuppett's arthritis and other conditions in her neck, her fibromyalgia, and her treatment for headaches predating the accident. The complete exclusion of Walker's videotaped testimony also prevented the Estate from presenting evidence regarding the mildness of the accident and Cuppett's condition immediately thereafter.

The primary focus of Cuppett's argument that the trial court's evidentiary rulings were correct is the fact that the Estate never presented its own expert testimony, to contradict Dr. Crawford's, directly opining that the right-side neck pain she complains of is being caused by the arthritic and other conditions her neck, rather than injuries inflicted by the

accident; therefore, Cuppett claims, the redacted records and excluded testimony were irrelevant. In support of this argument, Cuppett cites to *Daub v. Daub*, 629 N.E.2d 873 (Ind.Ct.App.1994), *trans. denied*. There, we noted that an essential element in a cause of action for negligence is the requirement of a reasonable connection between a defendant's conduct and the damages that a plaintiff claims to have suffered. *Id.* at 877. We also observed that the question of the causal connection between a permanent condition, an injury, and a pre-existing affliction or condition is often a complicated medical question. *Id.* at 877–78. Thus, we held that when the issue of causation is not within the understanding of a layperson, testimony of an expert witness on the issue is necessary. *Id.* at 878; *see also Muncie State Transit Auth. v. Smith*, 743 N.E.2d 1214, 1217 (Ind.Ct.App.2001) (stating, "when the cause of the injury is not one which is apparent to a lay person and multiple factors may have contributed to causation, expert evidence on the subject is required."). Cuppett contends that *Daub* and *Smith* forbade the Estate from introducing any evidence or conducting any cross-examination regarding other possible causes for Cuppett's pain in the absence of expert testimony that such causation was likely.

■ The difficulty with Cuppett's argument is that it confuses the issue of the burden of proof with the issue of the relevancy or admissibility of evidence and the proper scope of cross-examination. *Daub* was specifically addressed to a plaintiff's burden of proving causation; *Smith* addressed a worker's compensation claimant's similar burden.[4] Neither addressed

---

4. The following cases cited by Cuppett also concern a plaintiff's burden of proving causation of injuries or damages, not the admissi-

bility of evidence or proper scope of cross-examination by a defendant: *Smith v. Syd's Inc.*, 598 N.E.2d 1065, 1066 (Ind.1992);

the relevancy of causation evidence that contradicts the only expert testimony or suggested in any way that such evidence is necessarily irrelevant or inadmissible. Instead, it is evident that defendants in personal injury actions are entitled to thoroughly challenge a plaintiff's expert with respect to that expert's causation opinions. It is axiomatic that the accuracy, consistency, and credibility of an expert's opinions may properly be challenged by vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact. *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 461 (Ind.2001).

 Doctors and other expert witnesses are not oracles whose opinions, once stated, cannot be questioned or refuted by other evidence, even if that evidence does not come in the form of another expert's testimony. It is clear, for example, that a jury may reject unanimous medical expert testimony that a criminal defendant was legally insane at the time he or she committed a crime where there is evidence that tends to undermine such testimony. *See Cate v. State*, 644 N.E.2d 546, 547–48 (Ind.1994) (holding jury was free to reject unanimous opinion of five psychiatrists that defendant was legally

insane where psychiatrists' assertions were not uncontroverted by other evidence). The law in Indiana is that "[e]xpert opinion regarding causation may be admissible and yet in conjunction with other evidence may be either sufficient or insufficient to support a verdict." *Strong v. State*, 538 N.E.2d 924, 930 (Ind.1989). "[A]s is virtually the unanimous rule in this nation's jurisdictions, the jury is free either to accept or reject the opinion of the expert witness; the finder of fact may supplant its own conclusion for that of the expert." *Id.* at 931 (quoting *Noblesville Casting Div. of TRW v. Prince*, 438 N.E.2d 722, 729 (Ind.1982)). This rule would seem to have little meaning if, as in this case, a defendant cannot challenge or cast doubt upon the opinion of a plaintiff's expert that the plaintiff was injured by the defendant with evidence that the plaintiff suffers from a pain-producing disease or mechanism, unrelated to the defendant's negligence, in the precise area of the body where the plaintiff claims to suffer ongoing pain.[5]

 In an older case from this court, we addressed the standard of admissibility for a personal injury defendant to introduce evidence of a plaintiff's medical prob-

*Schloot v. Guinevere Real Estate Corp.*, 697 N.E.2d 1273, 1276 (Ind.Ct.App.1998); *Johnson v. Bender*, 174 Ind.App. 638, 644, 369 N.E.2d 936, 940 (1977). *Western & Southern Life Ins. Co. v. Danciu*, 217 Ind. 263, 26 N.E.2d 912 (1940), also cited by Cuppett, holds that lay witnesses cannot offer an expert opinion with respect to disease diagnosis, which is consistent with current Indiana Evidence Rule 702. The Estate did not seek to offer any lay witness testimony regarding Cuppett's diagnosis, but to thoroughly examine Dr. Foley and thoroughly cross-examine Drs. Crawford and Cross regarding other possible documented causes of Cuppett's continuing neck pain and headaches. As for Michael Walker, he did not attempt to "diagnose" Cuppett, but merely described the circumstances of the accident and her failure to

complain of any injuries immediately thereafter. *Danciu* also held that lay witnesses are competent to testify as to objective symptoms (or lack thereof) of an illness or condition, which is what Walker did. *See id.* at 273–74, 26 N.E.2d at 916.

5. Cuppett has made no argument that the accident aggravated any pre-existing condition she may have had, in which case she would have had the burden of establishing a logical basis for apportioning between the pre-existing condition and injuries caused by Walker in order to recover the full amount of her claimed damages from the Estate. *See Dunn v. Cadiente*, 516 N.E.2d 52, 56 (Ind. 1987).

lems that are unrelated to the defendant's negligence. We stated: "The general rule is that cross-examination and other evidence is admissible to lay a basis for impeachment or show that the injury complained of is due to some other cause where the present injury and the prior injury or condition are similar, or where a causal relationship between them can be shown." *Rondinelli v. Bowden,* 155 Ind. App. 582, 586, 293 N.E.2d 812, 814–15 (1973). If the cross-examiner fails to come forward with evidence showing a logical nexus or causal relationship between the injury sued on and the unrelated injury or condition, the evidence may be excluded. *Id.* The test of admissibility is not probability, but the possibility that a plaintiff's claimed damages resulted from a condition or event unrelated to the defendant's negligence. *See id.*

Here, Cuppett stresses several times in her brief that the Estate presented no evidence linking her "prior medical history with her collision injuries," and, essentially, the Estate failed to establish any possible nexus between that history and her claimed damages. Appellee's Br. p. 21. This argument is ill defined. It seems to concede that her arthritis and degenerative conditions in the right side of her neck are completely unrelated to the accident— which, of course, is precisely why the Estate believes the jury should have been allowed to know of those conditions as another possible source of Cuppett's continuing pain. Cuppett's objective complaints are that she has continuing right-side neck and shoulder pain and headaches as a result of the accident. The Estate's proffered evidence that she had arthritis and other degenerative conditions in the right side of her neck and that she has been diagnosed with fibromyalgia, coupled with medical evidence that these conditions

may cause pain and that she was being treated with prescription medicine for headaches prior to the accident, provides a possible logical nexus to her complaints and meets the *Rondinelli* standard of admissibility.

One recent case from this court, in which Cuppett's attorney participated, warrants further explanation with respect to this issue. In *Kristoff v. Glasson,* 778 N.E.2d 465 (Ind.Ct.App.2002), we affirmed the trial court's decision to exclude certain deposition testimony on cross-examination of one of the plaintiff's expert witnesses. Following an automobile accident, the plaintiff in *Kristoff* claimed that she began suffering from frequent headaches and neck pain. A physician who treated the plaintiff testified on direct examination that he diagnosed her as suffering from post-concussive syndrome resulting from striking her head on the windshield of her car. On cross-examination, defense counsel elicited testimony that the plaintiff had a history of suffering from anxiety or depression before the accident. We held that the trial court had properly precluded the jury from hearing this testimony because it was irrelevant. *Id.* at 473. In so doing, we noted that the physician testified that the plaintiff's current anxiety and depression resulted from getting no relief from her headaches,[6] and that she "did not testify that anxiety or depression could cause post-concussive syndrome, which was her diagnosis...." *Id.* By contrast, Drs. Crawford and Foley did testify that the degenerative conditions in Cuppett's neck could cause pain, with Dr. Crawford even acknowledging that the CT scans and x-rays of her neck were consistent with Dr. O'Brien's diagnosis of arthritis as a likely cause of her continuing neck pain. The jury was not permitted to hear this

---

6. The plaintiff sought no damages for psycho- logical or emotional injury.

testimony however, which, unlike in *Kristoff,* we conclude was highly relevant to determining the extent, if any, the accident caused the damages she claimed.

We further observe that there is no requirement that a defendant present evidence contradicting a plaintiff's claim of injuries during the defendant's case-in-chief. A case cited by Cuppett, *Manzo v. Estep,* 689 N.E.2d 474 (Ind.Ct.App.1997), is instructive in this regard. In that case, we were asked to review a jury's award of zero damages in a personal injury action where the defendant's liability was stipulated. Although we reversed and remanded for a new trial with respect to some damages claims that were undisputed at trial, we refused to disturb the jury's award of no damages with respect to certain claimed injuries because defense counsel presented contrary evidence and argument concerning pre-existing conditions and the nature, source, and extent of her claimed injuries. *Id.* at 476–77. We attached no significance to the fact that defense counsel presented this contrary evidence during cross-examination and had rested without presenting any testimony of his own, except with respect to the items of damages that were undisputed during the plaintiff's case-in-chief. *Id.* at 476, n. 5. Thus, a defendant may successfully challenge a plaintiff's claims as to the nature, extent, and source of her injuries through cross-examination and argument; a defendant is not limited to doing so only through the presentation of a case-in-chief.

Specifically with respect to the redacted documents, the Estate contends that it should have been entitled to introduce unredacted versions of them pursuant to Indiana Evidence Rule 106. That rule essentially embodies what was known as the "completeness doctrine" before the passage of the Indiana Evidence Rules in 1994 and provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time the introduction of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously with it." It is designed to avoid misleading impressions caused by taking a statement out of its proper context or otherwise conveying a distorted picture by the introduction of only selective parts of the document. *Lieberenz v. State,* 717 N.E.2d 1242, 1248 (Ind.Ct.App.1999), *trans. denied.* "The rule may be invoked to admit omitted portions of a statement in order to (1) explain the admitted portion; (2) place the admitted portion in context; (3) avoid misleading the trier of fact; or (4) insure a fair and impartial understanding of the admitted portion." *Id.* A court need not admit the remainder of the statement, or portions thereof, that are neither explanatory of nor relevant to the portions already introduced. *Id.*

Cuppett contends that much of the redacted material from the documents the Estate wished to introduce was inadmissible because they contained medical opinions. Under Indiana's Rule 106, the redacted portions of a document are still subject to normal rules of admissibility before they may be admitted. *See Stanage v. State,* 674 N.E.2d 214, 216 (Ind.Ct. App.1996).[7] Opinions and diagnoses contained in medical records, although they constitute an exception to the hearsay rule pursuant to Indiana Evidence Rule 803(6), still must meet the requirements for expert opinions set forth in Indiana Evidence

---

7. Judge Miller opines, however, "the better view is that the Rule 106 right to immediate completeness is not limited to admissible evidence." Robert L. Miller, Jr., *Courtroom Handbook on Indiana Evidence* 24 (2002).

Rule 702 in order to be admitted into evidence. *Brooks v. Friedman,* 769 N.E.2d 696, 701 (Ind.Ct.App.2002), *trans. denied.* Therefore, Cuppett argues, because the Estate did not prove the expert qualifications of the doctors who rendered opinions or made statements in the redacted portions of her medical records, the trial court properly allowed the redactions to stand.

In this case, however, it is readily apparent that the redactions from Cuppett's medical records were not motivated by a desire to separate inadmissible evidence from admissible evidence, but to exclude any suggestion that the neck pain and headaches Cuppett claims were caused by Walker's negligence actually may have had another source. The unredacted portions of Cuppett's records are replete with medical opinions of various kinds; for the most part, the only medical opinions excluded were those mentioning arthritis or other related pain-producing conditions in Cuppett's neck or those indicating Cuppett was being treated for headaches prior to the accident. For example, there are medical opinions or diagnoses in unredacted parts of the records submitted by Cuppett referring to her neck pain as being caused by the accident. A record from Dr. Steven Segal opines that Cuppett "had sustained a chronic myofascial pain syndrome," which is a condition related to tissues surrounding muscles that Cuppett asserts was caused by the accident. Plaintiff's Ex. 27. A record from Dr. Sachin Dave states that Cuppett had "[c]ervical neck pain following a motor vehicle accident." Plaintiff's Ex. 28. Neither Dr. Segal nor Dr. Dave testified, nor did Cuppett present any evidence regarding their qualifications. Additionally, it was Cuppett who introduced, for example, the record from Dr. O'Brien into evidence and who asked the jury to consider it, but only after being allowed to exclude his opinion that

her ongoing neck pain was consistent with arthritis. Having put these opinions and diagnoses before the jury, Cuppett could not legitimately claim that other medical opinions and diagnoses by doctors who did not testify, but that are less friendly to her claim for damages, were inadmissible.

▪ Even assuming the medical opinions Cuppett redacted from her medical records were, standing alone, inadmissible, this seems to be a classic case of "opening the door" to their admissibility. A party may "open the door" to otherwise inadmissible evidence by presenting similar evidence that leaves the trier of fact with a false or misleading impression of the facts related. *See Ortiz v. State,* 741 N.E.2d 1203, 1208 (Ind.2001); *see also Williams v. State,* 733 N.E.2d 919, 926 n. 4 (Ind.2000) (referring to "doctrine of curative admissibility"). Because of the redactions from the medical records and exclusions of certain testimony by Drs. Crawford, Cross, and Foley, the jury was left with the impression that the medical opinion regarding the causation of Cuppett's neck and shoulder pain was unanimous, and that there was no other possible cause of that pain other than the accident caused by Walker. Such an impression is fundamentally misleading and, in fact, is false.

▪ Additionally, Indiana Evidence Rule 705 provides that an expert may be required to disclose the underlying facts or data for his or her opinion on cross-examination. "The cross examiner may limit her examination to facts or data that undermine the witness's opinion, . . . or may elicit other opinions related to that stated on direct examination." Robert L. Miller, Jr., *Courtroom Handbook on Indiana Evidence* 234 (2002). Here, Dr. Crawford, the only testifying physician to definitively link Cuppett's ongoing neck pain and headaches with the accident, indicated during

his deposition that reports by other doctors were part of the information he relied upon in rendering his own medical opinions. Plaintiff's Ex. 61, p. 34. Cuppett's attorney also went through her extensive medical records with Dr. Crawford before he offered his expert opinion regarding the causation of her ongoing pain. Under Rule 705, the Estate was entitled to question Dr. Crawford regarding notations in those medical records that arguably undermined his opinion, at the very least for impeachment purposes, if not as substantive evidence.

The trial court also allowed Cuppett to redact extensively from notes taken by her chiropractor. The redacted notes indicate that she was seen repeatedly for neck pain; the unredacted notes also indicate that she often was simultaneously treated for lower back and knee pain, which she has never asserted were related to the accident. Nevertheless, Cuppett was allowed to represent to the jury that she was entitled to recover from the Estate the *full* amount of her chiropractic treatment; the trial court granted judgment on the evidence that all of these expenses were related to the accident. Similarly, Cuppett was allowed to redact from other records that although she has made frequent doctor visits complaining of neck pain, she simultaneously has been seen for a variety of ailments not related to the accident, such as hypertension, allergies, and obesity, at those very same visits. Yet, again, Cuppett claimed the entirety of the expense of these visits as attributable to the accident; the trial court granted judgment on the evidence that she was entitled to them.

We have uncovered no case in Indiana that is directly on point on this particular issue: whether a plaintiff in a personal injury action may claim entitlement to medical expenses as an element of damages without disclosing to the fact-finder that some of the medical treatment received during certain visits was actually related to ailments with no claimed connection to a defendant's negligence. What we have discerned, however, is that this clearly is not permissible. First, we note the well-established proposition that a plaintiff bears the burden of establishing at trial that claimed medical expenses incurred as the result of an injury were both reasonable and necessary. *Smith v. Syd's, Inc.,* 598 N.E.2d 1065, 1066 (Ind.1992). We conclude evidence that many of Cuppett's medical office visits included diagnoses and treatments completely unrelated to any claimed accident injuries is highly relevant to the question whether the entirety of the bill for such visits were both reasonable and necessary because of the accident and should have been admitted.

There is also one Indiana case that comes close to addressing the issue in this case, although it does so from a different perspective. In *Clouse v. Fielder,* 431 N.E.2d 148 (Ind.Ct.App.1982), a plaintiff brought suit to recover damages, including medical expenses, incurred as the result of an automobile accident caused by the defendant. The plaintiff was also injured in a second accident that occurred shortly after the one involving the defendant, and she was treated by the same doctor for both accidents. Because the doctor's records did not clearly indicate which of his bills for treatment were related to which accident, he personally prepared two exhibits, one listing expenses related to the first accident, the other for the second accident. Only the exhibit listing the expenses related to the first accident, Exhibit 12, was offered into evidence. Additionally, the doctor stated that with respect to visits related to the first accident, he often would treat the plaintiff for other ailments as well, such as colds, but only charge one

fee. After the defendant objected to the introduction of Exhibit 12 for this reason, the doctor amended Exhibit 12 by indicating that only seventy-five percent of the charges listed on it were related to the accident. On appeal, the defendant claimed the trial court had improperly admitted Exhibit 12, even as amended by the doctor, because it contained irrelevant information and served to confuse the jury. We disagreed, concluding the irrelevant information, as well as the possibility of confusion, was alleviated when it was clearly explained to the jury, and written on the face of Exhibit 12, that only seventy-five percent of the charges it listed were related to the accident. *Id.* at 154. *Cf. also Poltorak v. Sandy*, 236 Pa.Super. 355, 345 A.2d 201, 204 (1975) (holding trial court erred in allowing plaintiffs to submit medical bills into evidence where they included treatment for a variety of ailments, not just accident-related problems, and doctor could not specify which parts of the bills were attributable only to accident-related treatments).

■■ Here, of course, unlike in *Clouse* or in *Poltorak*, the Estate *wanted* the jury to see that many of Cuppett's medical office visits included treatment for ailments completely unrelated to the accident in order to argue against the reasonableness and necessity of the entirety of those bills. That defense counsel here chose a different strategy from counsel in *Clouse* or *Poltorak* does not alter the importance of those cases for our purposes. They clearly indicate that where a plaintiff seeks recovery of medical expenses for treatment allegedly required because of a defendant's negligence, but many office visits

or procedures simultaneously addressed other unrelated ailments, the plaintiff must attempt to establish that the entirety of the expenses are "reasonable and necessary," or what percentage of them are. Alternatively, a defendant must be free to argue that only a certain percentage of medical expenses, if any, are recoverable because of the plaintiff's receiving simultaneous treatment for multiple ailments. Unlike in *Clouse*, Cuppett made no attempt to apportion the medical bills when she received treatment for a variety of ailments, not just her allegedly accident-related problems; instead, she was allowed to represent to the jury that there was no question of apportionment.[8] This was erroneous. The Estate should have been able to present the full, unredacted medical bills to the jury pursuant to Rule 106 to provide an accurate and non-misleading picture of what they contained.

■■■ Turning to the videotape deposition of Walker himself, it was entirely excluded from evidence on the basis that his description of the accident was irrelevant to Cuppett's damages claims because Walker's 100 percent liability for the accident was established before the trial on damages. In Indiana, however, evidence as to the severity (or lack thereof) of an automobile accident is relevant to a plaintiff's claim of injuries resulting from the accident. *See Conklin v. Demastus*, 574 N.E.2d 935, 940 (Ind.Ct.App.1991) (reversing grant of new trial to plaintiff and noting evidence supporting verdict in favor of defendant, including "the testimony of the police officer called to the accident scene who indicated that the mishap involved only minor damage to the automobiles, . . .

---

8. In fact, Dr. Crawford was the only witness Cuppett called to testify as to the reasonableness and necessity of the charges for her chiropractor visits; when specifically asked, Dr. Crawford could offer no opinion about

whether a chiropractor would charge the same for one visit, regardless of the number of complaints that the patient had. Plaintiff's Ex. 61, p. 162.

and no injuries were reported at the scene...."). Thus, it was erroneous to conclude that the entirety of Walker's deposition was irrelevant and inadmissible with respect to his description of the minor nature of the accident and Cuppett's demeanor immediately thereafter.[9]

Cuppett also argues that all of the evidence the Estate contends was improperly excluded was inadmissible under Indiana Evidence Rule 403 as highly prejudicial. However, Rule 403 only allows trial courts to exclude evidence if its probative value is substantially outweighed by the danger of *unfair* prejudice, not simply prejudice to a party's theory of the case. As Judge Miller has noted, "The legitimate force of evidence should be weighed in the balancing as probative value, not as prejudice." Robert L. Miller, Jr., *Courtroom Handbook on Indiana Evidence* 50 (2002) (citing *United States v. Johnson*, 575 F.2d 1347, 1362 (5th Cir.1978)). " 'Unfair prejudice' addresses the way in which the jury is expected to respond to the evidence; it looks to the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence 'to suggest decision on an improper basis....' " *Ingram v. State*, 715 N.E.2d 405, 407 (Ind.1999) (quoting 12 Robert L. Miller, *Indiana Practice* § 403.102 at 284 (1995)). The existence of pain-producing mechanisms in the right side of Cuppett's neck that do not appear to be related to the accident caused by Walker certainly is prejudicial to Cuppett. It is also highly relevant, however, to the weight to be given Dr. Crawford's testimony about the cause of Cuppett's lingering neck pain, and would not provide an improper or inflammatory basis upon which the jury could have reached a verdict. We do not perceive any *unfair* prejudice in this evidence. The extent to which it tends to diminish Cuppett's claim of neck pain resulting solely from the accident goes to its probative value. We do agree that certain portions of Walker's videotape deposition might be properly excluded for their low probative value and potential for unfair prejudice, such as where he discusses his need for a liver transplant. His descriptions of the accident, however, are probative and not unfairly prejudicial.

We emphasize that it was not the Estate's burden to prove, for example, that Cuppett's headaches predating the accident were causally related to the headaches postdating the accident; it was Cuppett's burden as the plaintiff to prove the post-accident headaches were caused by the accident and not a pre-existing condition. It was not the Estate's burden to prove that the arthritis and degenerative conditions in the right side of Cuppett's neck caused the lingering pain in that precise area that she complained of; it was Cuppett's burden to prove that the pain was related to the accident and not to a pre-existing or separate condition. It was not the Estate's burden to prove that Cuppett could not have suffered long-term neck pain because the accident was minor; it was Cuppett's burden to prove that that was indeed the case. These issues were not affirmative defenses. Because it is apparent the trial court excluded evidence and cross-examination proffered by the Estate on the erroneous assumption that it was required to meet a plaintiff's burden of proving causation before it could challenge Cuppett's experts with conflicting evidence, we conclude it abused its discretion in excluding this evidence for all the reasons we have set forth.

---

9. The fact that an automobile accident appears minor does not necessarily mean that it cannot result in lingering, permanent injuries of some kind, but it is evidence that a jury may consider nevertheless.

■ Having concluded that the trial court abused its discretion in refusing to allow the Estate to enter unredacted copies of Cuppett's medical records into evidence, in limiting the testimony of Drs. Crawford, Cross, and Foley, and completely excluding the videotaped testimony of Walker, we must now address whether these errors were "inconsistent with substantial justice." We conclude they were. These exclusions went to the heart of the matter the jury was asked to decide: the extent to which Cuppett's ongoing neck pain and headaches were related to Walker's negligence, and additionally the extent to which her total medical bills since the accident and in the future were and will be necessarily incurred because of it. We also observe that in this case, the jury did not conclude that Cuppett was entitled to all the damages she claimed Walker caused; it was given no opportunity to decide the issue of past medical expenses and only assessed damages of $10,001 above that amount, well below Cuppett's claims. It was the trial court that decided *all* of Cuppett's claimed past and future medical expenses were related to the accident. Had the jury's verdict in this case been allowed to stand and if it did not partially include a judgment on the evidence, we might have been persuaded to conclude that even if it had seen the evidence of Cuppett's other medical conditions, it would have awarded an amount similar to what it actually awarded, believing Cuppett was entitled to recover some, but not all, of her claimed damages. But that did not happen and we have no way of knowing what the jury would have awarded if left to its own devices.

■ Instead, the trial court granted judgment on the evidence that Cuppett was entitled to recover all of her claimed past medical expenses from the Estate. When considering a motion for judgment on the evidence, a trial court must view the evidence in a light most favorable to the nonmoving party. *Faulk v. Northwest Radiologists, P.C.,* 751 N.E.2d 233, 238 (Ind. Ct.App.2001), *trans. denied.* Here, if the erroneously excluded evidence is considered, as the jury should have been able to consider it, and viewing all of that evidence in a light most favorable to the Estate, the granting of judgment on the evidence for all of Cuppett's claimed past medical expenses would amount to improperly invading the jury's fact-finding function. Therefore, we conclude that the exclusion of the evidence we have referenced amounts to reversible error.

The same is true with respect to Cuppett's claimed future medical expenses. The Estate was precluded from presenting any meaningful cross-examination or argument regarding the reasonableness and necessity of these claimed expenses, due to the trial court's evidentiary rulings.[10] Therefore, we must reverse the judgment against the Estate in its entirety and remand for further proceedings consistent with this opinion.

---

**10.** Aside from the excluded medical evidence, there was other evidence relevant to the question of future medical expenses. For example, there are indications that Cuppett was sometimes reluctant to accept her doctors' advice with respect to treatment recommendations. She told Dr. Crawford on October 30, 2001, that she had not chosen to follow his advice to visit a pain psychologist and that she felt like she did not need any more doctors. Dr. Crawford told Cuppett at this same visit "that I felt there was little more that I was adding to her care at this time...." Plaintiff's Ex. 37. (Dr. Crawford's deposition testimony regarding these comments was excluded by the trial court for reasons that are unclear). Although Cuppett eventually did return to Dr. Crawford and began seeing other doctors and a pain psychologist, this information seems highly relevant to the question of whether she would follow through with treatment.

## II. Independent Medical Exam

Our decision with respect to the trial court's evidentiary rulings, and the reversal of the judgment against the Estate, moots its arguments regarding the Trial Rule 37 sanctions that were premised upon Cuppett's prevailing on the factual assertions that the Estate failed to admit and which, by necessity, are also now reversed. We will briefly address the trial court's refusal to grant the Estate leave to compel Cuppett to submit to an IME.

It is within the discretion of the trial court to place bounds on the extent of discovery and, therefore, the trial court may require discovery be completed by a certain date to prevent delay of the trial. *Coster v. Coster,* 452 N.E.2d 397, 400 (Ind.Ct.App.1983). In fact, the sequence and timing of discovery has been left to the almost unlimited discretion of the trial court. *Amax Coal Co. v. Adams,* 597 N.E.2d 350, 353 (Ind.Ct.App.1992), *trans. denied.* Here, the trial court indicated that the deadline for naming expert witnesses was October 1, 2000. At that time, the Estate had not named any expert witnesses, which necessarily would have included a physician performing an IME, which also had not been conducted at that time. The Estate did not move for an IME until March 25, 2002, approximately two weeks before the April 9, 2002, trial date, although a pre-trial order stated that any IME was to be conducted no later than ninety days before the trial. The Estate filed its late motion because it claimed to have received new evidence regarding additional medical treatment by Cuppett, apparently mostly chiropractic treatment.

We admit there were reasons here that the trial court might have deviated from its pre-trial order and allowed the IME to take place, such as the numerous continuances in this case for other reasons and the disclosure of some previously unknown medical bills. However, the existence of such reasons does not mean the trial court abused its discretion in adhering to its pre-trial order and concluding that the Estate's motion for an IME was untimely, especially given that the extent of injuries Cuppett sustained in the accident appears to have always been a contested matter. Given the trial court's "almost unlimited discretion" in this area, we cannot say there was an abuse of such discretion in this case.[11] *See id.*

## Conclusion

The trial court abused its discretion in refusing to allow the Estate to present any evidence, through documentation and the direct and cross-examination of physicians, that there were other possible causes of Cuppett's chronic neck pain and headaches aside from the accident with Walker. It also abused its discretion in allowing Cuppett to place redacted versions of her medical records and bills into evidence. Therefore, we reverse the judgment against the Estate, as well as the Trial Rule 37 sanctions, and remand for a new trial on the subject of damages.

Reversed and remanded.

FRIEDLANDER, J., and VAIDIK, J., concur.

---

11. We observe that the Estate's motion for an IME was untimely with respect to the trial date set at the time the motion was made, i.e. April 9, 2002, but that it was *not* untimely with respect to what turned out to be the actual trial date of November 12, 2002. Although this fact alone is not sufficient to render the trial court's refusal to allow an IME an abuse of discretion, it is likely that allowing an IME also would have fallen within the trial court's sound discretion.