# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**ATTORNEY FOR APPELLANT**

T. Andrew Perkins
Peterson Waggoner & Perkins, LLP
Rochester, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of B.J., J.J., (Children) and M.R. (Mother);

M.R. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

October 26, 2017

Court of Appeals Case No.
25A03-1705-JT-993

Appeal from the Fulton Circuit Court

The Honorable A. Christopher Lee, Judge

Trial Court Cause No.
25C01-1608-JT-130
25C01-1608-JT-131

**May, Judge.**

[1] M.R. ("Mother") appeals the involuntary termination of her parental rights to B.J. and J.J. (collectively, "Children"). She presents many issues for our consideration, which we consolidate and restate as:

> 1. Whether the Department of Child Services ("DCS") presented sufficient evidence the conditions under which Children were removed would not be remedied;
>
> 2. Whether DCS presented sufficient evidence termination was in the best interests of Children; and
>
> 3. Whether the trial court abused its discretion when it admitted alleged hearsay into evidence.

We affirm.

## Facts and Procedural History

[2] Mother and Jo.J. ("Father")[1] are parents of B.J. and J.J., born January 5, 2008, and November 24, 2009, respectively. On March 18, 2011, DCS removed Children from Mother's care after receiving a report J.J. had tested positive for cocaine after being left in the care of Mother's boyfriend, who also tested positive for cocaine. Additionally, Mother was not "home when a transport bus attempted to drop off [B.J.]," and the family was residing in a motel which was in a condition "below standards." (Tr. at 52-3.)

---

[1] Father's rights were also terminated, but he does not participate in this appeal.

[3]     On May 18, 2011, the trial court adjudicated Children as Children in Need of Services ("CHINS"), but they were returned to Mother's care for a temporary home trial visit. Two or three months later, Children were removed from Mother's care at Mother's request and placed into foster care. On April 4, 2014, Children were returned to Mother's care and the CHINS case was closed based on Mother's compliance with services, improvement based on those services, and stable housing with Mother's boyfriend.

[4]     On October 7, 2014, DCS again removed Children from Mother's care after DCS received a report Mother's older son, thirteen-year-old Z.D., was smoking marijuana and drinking alcohol while he was supposed to be providing care for Children. Additionally, no one present at the home had Mother's contact information and the home was not clean. On February 24, 2015, the trial court adjudicated Children as CHINS. On March 13, 2015, the trial court ordered Mother to participate in a mental health assessment, homemaker services, medication management, home-based case management, and individual counseling; follow all recommendations from those assessments and services; and participate in supervised visits with Children.

[5]     In April 2016, the State charged Mother with Level 4 felony sexual misconduct with a minor for a sexual relationship she admitted having with a fifteen-year-old friend of Z.D. from October 2015 to approximately February 2016. Mother did not participate in services to assist in obtaining stable housing after her arrest, and services were discontinued in December 2016. Mother attended the supervised visits but, after some conflict, those visits were changed to

therapeutic visits. On August 24, 2016, DCS filed a petition for termination of Mother's parental rights to Children.

[6] On February 3, 2017, the trial court held a fact-finding hearing on DCS's termination petition. On April 7, 2017, the trial court issued an order terminating Mother's parental rights to Children.

# Discussion and Decision

[7] We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[8] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely

because there is a better home available for the children, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet her parental responsibilities. *Id.* at 836.

[9] To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

Mother challenges the court's conclusions the conditions under which Children were removed would not be remedied, the continuation of the parent-child relationship posed a risk to Children, and termination was in the best interests of Children.[2]

### *Reasonable Probability Conditions Would Not Be Remedied*

The trial court must judge a parent's fitness to care for her children at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the

---

[2] The trial court found the conditions under which Children were removed would not be remedied and the continuation of the parent-child relationship posed a threat to Children. DCS does not have to prove both. The statute is written in the disjunctive, and DCS must prove either by clear and convincing evidence. *See* Ind. Code § 31-35-2-4. Because the evidence supports the conclusion there was a reasonable probability conditions leading to Children's removal would not be remedied, we need not address whether the continuation of the parent-child relationship posed a threat to Children's well-being. *See In re L.S.,* 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *reh'd denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002) (because statute is written in the disjunctive, court needs to find only one requirement to terminate parental rights).

requisite reasonable probability" that the conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[13] Here, Children were removed from Mother's care because Children "had been left by their mother without adult supervision." (App. Vol. II at 62.)[3] Additionally, the home "did not have running water, clothing was scattered about, dishes with moldy food were found throughout the home, animal feces was lying on the floor, and the children's older brother and his friends were smoking marijuana while the younger siblings were present[.]" (*Id*.) Regarding earlier CHINS adjudications involving Children, the trial court found those cases "were initially based on Mother's failure to provide proper supervision, inappropriate housing, and Mother's boyfriend [A.C.] and her child, [J.J.,] both testing positive for Cocaine." (*Id*. at 61.)

[14] Mother argues three of the trial court's findings[4] do not support the conclusion she had not remedied the conditions under which Children were removed. These findings stated:

---

[3] The trial court entered identical orders of termination for each child. We cite the order regarding B.J.

[4] Mother also contests Findings 10 and 11:

> 10. At dismissal of the 2011 CHINS cases, DCS reunified the family but did so with lingering concerns. Delay in closure of these cases resulted from Mother's failure to maintain stable housing and employment, and her failure to participate in services during the earlier stages of the cases. Mother also had unstable, and dependent, relationships with a number of different partners.

> 11. At dismissal of the 2011 CHINS cases in 2014, DCS felt permanent reunification was largely dependent upon Mother maintaining a relationship with her current boyfriend, [S.W.], since the mother did not have her own housing and was not currently employed.

46. At the time of the termination hearing the Mother had housing with a female roommate and which was [sic] owned free and clear by the roommate, and which has room for two children.

47. At the time of the termination hearing the Mother was employed full time.

48. The Mother has participated in visits with the children and was generally compliant with services.

(*Id*. at 66.) Based on thereon, Mother contends termination was not supported by sufficient evidence and findings.

[15] When assessing a parent's fitness to care for a child, the trial court should view the parent as of the time of the termination hearing and take into account the changes that have occurred during the proceedings. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. However, the trial court must also "evaluat[e] the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of [a] child." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.

---

(App. Vol. II at 61.) Mother asserts the language of the findings "reference DCS's perception, and not the trial court's view[.]" (Br. of Appellant at 19.) Based thereon, Mother argues "DCS's perception of events, not the events themselves, somehow support the trial court's findings and the resulting termination. This would effectively grant a fact-finding role to DCS." (*Id.* at 20.)

We disagree. The trial court must evaluate "the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of child." *In re J.T.*, 742 NE.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. We categorize these statements as a reiteration of the history of the case, and nothing more. While they might restate DCS's position, they are stated as facts found by the trial court. Under *J.T.*, they are appropriate for the analysis of Mother's habitual patterns of conduct.

[16] While it is laudable Mother had adequate housing and employment at the time of the termination hearing, DCS also presented evidence Mother lived in four different residences in 2016, and "failed to follow recommendations to process a HUD application that might enable her to obtain appropriate housing." (App. Vol. II at 64.) Mother presented no evidence of employment, outside of her own testimony. Mother testified she had worked at Modern Materials for two weeks and worked at Subway for six months prior. She described her schedule, but was not sure exactly how much she made per hour. Thus, while she had housing and employment at the time of the hearing, her situation with neither could yet be considered stable.

[17] Regarding her compliance with services, the record indicates Mother participated in the services offered to her. However, "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change, or only result in temporary change." *In re J.S.*, 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). Mother does not seem to have benefitted from the services she completed. As of the termination hearing, her housing and employment had only recently stabilized, and there existed pending criminal charges against her for Level 4 felony sexual misconduct with a minor for incidents involving a fifteen-year-old friend of Z.D. While Mother is innocent until proven guilty, "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Matter of A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App. 1992).

[18] Mother's arguments are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court does not reweigh evidence or judge the credibility of witnesses). We therefore conclude DCS presented sufficient evidence to prove there was a reasonable probability the conditions under which Children were removed from Mother's care would not be remedied.

### Best Interests of Children

[19] In determining what is in the children's best interests, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the children's best interests. *In re J.S.*, 906 N.E.2d at 236.

[20] Here, Mother argues termination is not in the best interests of Children because she shares a bond with them and "[t]he children were difficult to handle regardless of placement[.]" (Br. of Appellant at 15.) DCS acknowledged the bond between Mother and Children during its opening statements, and the supervised parenting coordinator indicated Children were "always excited" to

see Mother and "appear very attached" to her. (Tr. at 193.) Additionally, Children's therapists recognized the behavioral issues for which Children were being treated were long-term and ongoing. B.J.'s therapist testified, "[w]ith the therapy we've been able to manage some things but a lot of behaviors have continued throughout the two years I've seen him." (*Id*. at 78.)

[21] However, B.J.'s therapist also testified B.J. "needs stability and security and predictability in his life more than anything and a feeling of safety and security so he needs a home where it's all those things can be established and maintained and I don't - I don't have any evidence this would happen with his mom." (*Id*. at 80.) J.J.'s therapist similarly stated:

> I think it would be really harmful to just continue to change [the relationship between Mother and J.J.] that he does have just - he's already dealing with like attachment issues and anger and all that other things that are going on so I think it would be really hard on him to continue to be moved around.

(*Id*. at 102.) Additionally, Children's GAL testified she "[didn't] have any doubt," (*id*. at 208), that termination was in Children's best interests because

> [Children] have never known stability with their mom, and they need to have it, and I don't foresee that happening with their mom, even though she wants it to happen. She clearly wants it to happen and she clearly has the intention of it happening, but it hasn't happened, and if anything - if nothing else, you have to learn from history, and her history of stability is not good with the kids.

(*Id*. at 204.)

[22] Mother's arguments are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court does not reweigh evidence or judge the credibility of witnesses). Based on the evidence and testimony, we conclude DCS presented sufficient evidence to prove termination of Mother's parental rights was in the best interests of Children.[5]

### *Admission of Hearsay*

[23] We review decisions concerning admission of evidence for an abuse of discretion. *Walker v. Cuppett*, 808 N.E.2d 85, 92 (Ind. Ct. App. 2004). An abuse of discretion occurs if the trial court's decision was clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id*. A trial court also abuses its discretion if its decision is without reason or is based on impermissible considerations. *Id*. Even if a trial court errs in a ruling

---

[5] Mother also argues a "generalized need for permanency and stability does not, without more, support termination of Mother's rights, particularly when the children are opposed to the stated DCS plan for permanency." (Br. of Appellant at 20.) In support of her argument, she cites *H.G. v. Indiana DCS*, 959 N.E.2d 272 (Ind. Ct. App. 2011), *reh'g denied*, *trans. denied*, in which we held, "A child's need for stability is of great importance; however, mere invocation of words like 'stability' or 'permanency' does not suffice to terminate parental rights." *Id.* at 293. *H.G.* is distinguishable.

In *H.G.*, the trial court noted the improvement mother and fathers had made to comply with the trial court's dispositional order and gain back custody of their children. The mother and one of the fathers, who were incarcerated, had taken multiple classes to lessen their time in prison and had continued relationships with the children. The other father had secured and provided proof of full time employment and was diligently looking for a suitable house. Here, Mother testified she had housing and employment, but provided no evidence to support those assertions. While Mother had completed some services, she ignored DCS's request to fill out paperwork for suitable independent housing. Finally, she was facing possible incarceration for her sexual relationship with a fifteen-year-old boy, which she admitted participating in even after she learned the boy was underage. We cannot say *H.G.* applies.

on the admissibility of evidence, we will reverse only if the error is inconsistent with substantial justice. *Id*.

[24] Mother argues the trial court abused its discretion when it allowed Family Case Manager ("FCM") Bryan Holcomb to testify regarding Mother's plan to move into a trailer at the beginning of the CHINS case linked to the termination case. Holcomb testified he received the information from the notes of a former FCM, who died suddenly during the proceedings. Mother objected to the admission of the evidence on the basis of hearsay, and the trial court first sustained that objection. DCS then laid a foundation for the evidence by asking questions regarding how Holcomb and other FCMs kept records. Mother again objected when Holcomb began to testify regarding the former FCM's notes, and the trial court overruled, stating:

> I am - given the - frankly the unusual history of this part, the fact that he is eluding [sic] to notes that are evidently kept in the progression of the case by a family case manager I'm going to allow him to provide testimony because I think that he has to have some of the history in order to kind of formulate how he approached the case moving forward so I'm going to overrule your objection and allow the testimony.

(Tr. at 117.)

[25] Hearsay is an out-of-court statement offered in a judicial proceeding to prove the truth of a matter asserted in the statement. Ind. Evidence Rule 801(c). In the event the trial court made an error in admitting hearsay testimony from

Holcomb, any error made was harmless. Indiana Appellate Rule 66(A) states, regarding harmless error:

> No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.

Additionally, "improper admission of evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgment." *In re E.T.*, 808 N.E.2d 639, 645-6 (Ind. 2004).

[26] Here, DCS presented evidence Mother had lived four places over the course of one year, had participated in services but had not seemed to benefit from them, and had pending charges filed against her for sexual misconduct with a minor. Children had been in placement for five of the previous six years, and while they still had behavioral issues, their therapists felt improvement was being made and it was in Children's best interest to have a stable home, which Mother could not provide. As there existed substantial evidence beyond the contested hearsay, any error in its admission was harmless. *See id.* (improper admission of evidence harmless when there exists additional substantial evidence to support trial court's decision).

# Conclusion

DCS presented sufficient evidence there was a reasonable possibility the conditions under which Children were removed from Mother's care would not be remedied and termination of Mother's parental rights were in Children's best interests. In addition, any error in the admission of FCM Holcomb's testimony regarding the former FCM's observations of Mother's housing situation was harmless. Accordingly, we affirm.

Affirmed.

Barnes, J., and Bradford, J., concur.